[No. A065778. First Dist., Div. Two. Apr. 6, 1995.]

JACOBS, MALCOLM & BURTT et al., Plaintiffs and Appellants, v. HENRY J. VOSS, as Director, etc., Defendant and Respondent.

1400

## COUNSEL

Parker & Crosland and David M. Parker for Plaintiffs and Appellants.

Daniel E. Lungren, Attorney General, Charles W. Getz IV, Acting Assistant Attorney General, and Sarah C. Backus, Deputy Attorney General, for Defendant and Respondent.

## OPINION

PHELAN, J.—Food and Agricultural Code section 56707[1] requires the Director of the Department of Food and Agriculture (the Director) to pay compensation out of a specified fund to farm products creditors who suffer losses when a licensed processor, broker, merchant, reseller, or dealer defaults on its obligations. Section 56708 places a ceiling on the amount of such payments. Appellants Jacobs, Malcolm & Burtt, Washington Vegetable Company, United Melon Distributors, and What A Tomato, Inc., brought this proceeding challenging the Director's allowance of certain claims in amounts below the statutory maximums. Appellants petitioned the superior court for a writ of mandate to compel respondent to pay the full amount of the claims up to the limits specified in section 56708. The court found the governing statutes ambiguous, but resolved the ambiguity adversely to appellants, concluding that the statutes permit the Director to allow smaller amounts under the circumstances shown by the record. We agree with this analysis, and affirm the judgment denying the petition for writ of mandate.

### BACKGROUND

In 1977 the Legislature created the Farm Products Trust Fund as part of the "Department of [Food and] Agriculture Fund." (§§ 56701-56702, subd.

---

[1]Except as otherwise noted, all further statutory references are to the Food and Agricultural Code.

(a)); Stats. 1977, ch. 876, § 5, pp. 2638-2639; see § 221.) The products fund is financed by a $125 fee assessed on every application for a license (or license renewal) as a processor, cash buying processor, produce broker, buyer, merchant, or dealer. (§ 56703; see §§ 55401 et seq. [licensure of processors and cash buying processors], 56101 et seq. [licensure of produce brokers, buyers, merchants, dealers].) The money so deposited "shall only be used to pay for farm products grown or produced within this state which have not been otherwise paid for. . . ." (§ 56704; see § 221 [sums deposited in Department of Food and Agriculture fund "shall be expended solely for the enforcement of the law under which the money was derived"].) Any remaining funds at the end of the year shall be credited to other years (§ 56704), and the Director may lower the amount of the annual fee if he finds a lower fee "sufficient to defray the costs in carrying out this chapter." (§ 56703.)

If a licensee defaults in paying for any farm product, unpaid farm products creditors may submit claims against the fund. (§§ 56705, 56707, subd. (a).) The Director then determines and verifies the "amount due" the claimants. (§ 56707, subds. (b), (c).) Thereupon, "the director shall pay, up to the amount specified in Section 56708, from the products fund to claimants." (§ 56707.) Section 56708 provides in pertinent part, "The director may only pay up to 50 percent of any claim from the products fund. In no case shall the total paid all the claimants under this chapter exceed fifty thousand dollars ($50,000) against any one licensee."

On May 17, 1993, appellants filed their verified petition for writ of mandate under Code of Civil Procedure section 1085. In it, they alleged that they are licensed produce dealers, all of whom were creditors of Berrymans Produce Company, a licensed produce seller, when it defaulted in 1989, leading appellants to file claims against the fund in the aggregate sum of $132,959.63. Two appellants were also creditors of another licensed seller, R.V. Produce Dealers, which defaulted in 1991, leading to aggregate claims of $83,600.54. Respondent initially refused to allow an administrative hearing to adjudicate the claims, whereupon appellants sought and obtained a writ of mandate from the superior court commanding respondent to process the claims in accordance with section 56705 et seq. Thereafter, respondent notified appellants that it had "authorized a maximum of $25,000 to be expended from the Fund for *all* claims against any one licensee or up to 30% of the claim of any one creditor." (Italics in original.) Appellants demanded payment of the maximum amounts allowed by section 56708: $50,000 per defaulting licensee, divided among claimants pro rata, not to exceed 50 percent of any individual claim. Respondent rejected these demands, asserting that it possessed the discretion to reduce the amount of payments below

the statutory maximum. Accordingly, appellants filed their petition seeking a writ of mandate compelling respondent to "comply with Code section 56707 and pay up to fifty percent (50%) of each approved individual claim for a total payment of Fifty Thousand Dollars ($50,000.00)."

In opposition to the petition, respondent filed the declaration of Don Henry, chief of the market enforcement branch of the department, which "is responsible for the administration of the Farm Products Trust Fund." He declared that in 1988, the Director adopted the recommendation of the market enforcement advisory committee "that the amount of payout from the Farm Products Trust Fund be adjusted under the authority of Food and Agricultural Code sections 56707 and 56708." "Since 1988," he continued, "the policy has provided that the Trust Fund only pays 30% of any claim and in no case more than $25,000 as to claims against any one licensee." This change was adopted "because if the maximum allowed by statute were paid to every claimant, the Trust Fund would run out of funds each year." For example, he declared, the fund had taken in $336,130 during the then-current fiscal year, and had paid out $398,236. Had it paid the maximum amounts allowable under the statutes, he declared, it would have paid out $778,576. The declaration continued: "The Trust Fund is an entirely self-supporting and separate account from the general fund of the Department of Food and Agriculture. The Fund is made up entirely of the $125 per year Trust Fund fee collected from each licensee. The money in the Trust Fund is not co[m]mingled with general fund monies, and is not used to support the Department. The Trust Fund is not part of the Department's budget. The cash balance at the end of any one fiscal year is carried over into the next fiscal year. None of the monies in the Trust Fund can be used for anything other than claims against the Trust Fund." He knew of no legal challenges to the reduced allowances between the time of their adoption in 1988 and the initiation of this litigation.

The trial court denied the petition on the grounds that "the language of Food and Agricultural Code sections 56707 and 56708 is susceptible to the interpretations placed on them by both parties. Since the Legislature has effectively limited the amount deposited into the Farm Products Trust Fund (Trust Fund), it is more reasonable to conclude that the Legislature intended the Director to use his discretion to determine what rate of payout up to the statutory maximum is available for all those valid claims made against the Trust Fund. The Director's policy has been in place since 1988 and has not been applied arbitrarily to these petitioners."

This timely appeal followed.

## ANALYSIS

This dispute centers around the meaning of sections 56707 and 56708 with respect to amounts which the Director may or must allow on claims against the fund. Appellants contend that the statutes confer no discretion on the Director to pay an amount below the 50 percent/$50,000 ceiling, but mandate payment of the full amount of the defaulted debt up to those limits. Appellants characterize the quoted language as "plain [and] unambiguous," thus invoking the "plain meaning rule": " 'When statutory language is . . . clear and unambiguous[,] there is no need for construction, and courts should not indulge in it.' " (*Atlantic Richfield Co.* v. *Workers' Comp. Appeals Bd.* (1982) 31 Cal.3d 715, 726 [182 Cal.Rptr. 778, 644 P.2d 1257], see *Rossi* v. *Brown* (1995) 9 Cal.4th 688, 695 [38 Cal.Rptr.2d 363, 889 P.2d 557] ["Where the language is clear, it should be followed."]; *People* v. *Gangemi* (1993) 13 Cal.App.4th 1790, 1795 [17 Cal.Rptr.2d 462].)

■ The plain meaning rule is inapplicable here because the operative phrase ("shall pay, up to the amount specified") is patently ambiguous with respect to the Director's power or duty, if any, to impose ceilings lower than those set by the Legislature. The meaning of the phrase is "plain" on only two points: (1) the Director shall pay; and (2) the payment shall not *exceed* the amount specified in section 56708.[2] At the same time, however, the quoted language necessarily implies a legislative intent or expectation that, under some circumstances or conditions, the Director may pay less than the specified amount. The statute fails to define those circumstances or conditions, and fails to provide any formula or guiding standard for determining such smaller amounts. This facial ambiguity flatly precludes reliance on the "plain meaning" of the statute, and forces us into the process of statutory construction.

The Director has already construed sections 56707 and 56708 as permitting him to adopt a formula reducing awards below the statutory maximum where such reductions are necessary to preserve the fund's ability to honor all valid claims. Courts generally give great weight and respect to an administrative agency's interpretation of a statute governing its powers and responsibilities. (*International Business Machines* v. *State Bd. of Equalization* (1980) 26 Cal.3d 923, 930-931 [163 Cal.Rptr. 782, 609 P.2d 1].) "A court must accord great weight to an administrative agency's construction of statutes it is charged with implementing and enforcing. Such a construction will be adhered to unless clearly erroneous or unauthorized [citations], that

---

[2]The "amount specified" in section 56708 is itself arithmetically indeterminate, i.e., a sum *less than or equal to* one-half the defaulted debt, or $50,000 per defaulting licensee. Assuming units of 1 cent, this formula yields 5,000,001 mathematically correct results.

is, unless it was arbitrary, capricious or had no reasonable or rational basis [citation]." (*General American Transportation Corp.* v. *State Bd. of Equalization* (1987) 193 Cal.App.3d 1175, 1182 [238 Cal.Rptr. 865], review den.)[3]

■ Appellants fail to demonstrate that the Director's interpretation is arbitrary, unreasonable, or unauthorized. They merely assert that by setting a maximum allowance lower than the one set by the statutes, the Director has inserted language not found there, thus violating the canons of construction set forth at Code of Civil Procedure sections 1858 and 1859.[4] However, given the lack of explicit legislative guidance concerning the handling of claims when allowable demands on the fund exceed its receipts, we can hardly view the Director's interpretation as an attempt to "rewrite" the statute. (Cf. *Vallejo Development Co.* v. *Beck Development Co.* (1994) 24 Cal.App.4th 929, 943 [29 Cal.Rptr.2d 669], review den.)[5]

Moreover the Director's interpretation is consistent with such evidence of legislative intent as we have been able to discover. In 1983 the Legislature amended the relevant statutes to increase the maximum payment from $25,000 to $50,000. The Enrolled Bill Report issued by the Department of Food and Agriculture stated that the fund then contained "a balance well in excess of $2 million, "and that the amendments would allow an increased award "provided there are sufficient funds." (Cal. Dept. of Food & Agr., Enrolled Bill Rep. on Assem. Bill No. 453 (1983-1984 Reg. Sess.) as amended July 13, 1983.) The Department of Finance was even more explicit: "This bill would raise the maximum payment . . . as long as sufficient funds

---

[3]Still greater judicial deference is accorded to a contemporaneous administrative interpretation "long acquiesced in by all persons who could possibly have an interest in the matter." (*Steelgard, Inc.* v. *Jannsen* (1985) 171 Cal.App.3d 79, 88 [217 Cal.Rptr. 152].) Uncontroverted evidence established that the policy under which the allowances here were calculated took effect on July 15, 1988. Branch Chief Henry declared that since that time, "to my knowledge, there have been no legal challenges to the Director's authority to take this action until this case was filed." Indeed, he presented department records indicating that three of the four claimants before us had previously acquiesced in payments calculated under the policy in question.

[4]"In the construction of a statute or instrument, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all." (Code Civ. Proc., § 1858.)

"In the construction of a statute the intention of the Legislature . . . is to be pursued, if possible . . . ." (Code Civ. Proc., § 1859.)

[5]Moreover, this criticism (that the Director's interpretation adds matter not found in the statute) is equally applicable to appellants' own interpretation, under which section 56707 provides in effect that the Director shall pay *the full value of the claims*, up to the amount specified in section 56708. On its face the statute is no more intrinsically likely to carry this meaning than one substituting, for the italicized words, "an amount determined in the Director's discretion," "an amount calculated to preserve the solvency of the fund," or "an amount calculated to permit the equitable payment of all valid claims."

are available. If there are insufficient funds in the account, payments will be made on a pro-rata basis." (Cal. Dept. of Finance, Enrolled Bill Rep. on Assem. Bill No. 453 (1983-1984 Reg. Sess.) an amended July 6, 1983.) These materials are properly accepted as evidence of legislative history. (*Bank of the Orient* v. *Town of Tiburon* (1990) 220 Cal.App.3d 992, 1002, fn. 11 [269 Cal.Rptr. 690], review den., disapproved on another point in *Morehart* v. *County of Santa Barbara* (1994) 7 Cal.4th 725, 743, fn. 11 [29 Cal.Rptr.2d 804, 872 P.2d 143], citing *Commodore Home Systems, Inc.* v. *Superior Court* (1982) 32 Cal.3d 211, 218-219 [185 Cal.Rptr. 270, 649 P.2d 912]; see also *People* v. *Edwards* (1991) 235 Cal.App.3d 1700, 1707, fn. 4 [1 Cal.Rptr.2d 631].) We find no suggestion of a contrary legislative intent.

■ We conclude that the statutes in question are not intended to, and do not, compel the Director to allow claims in the maximum amount if the fiscal condition of the farm products fund is insufficient to permit such allowance. In that situation the Director may allow claims in smaller amounts, provided he does not act arbitrarily or capriciously or otherwise in violation of law. There is no suggestion here of any legal infirmity in the Director's determination other than compliance with an assertedly unlawful policy. Since the policy appears lawful, the determination must stand.

The judgment is affirmed.

Kline, P. J., and Haerle, J., concurred.