Hines, Geraldine S., J.
This action arises out of a home mortgage loan the plaintiff, Frances Darden (“Darden”), received. Darden alleges that the loan violates the Massachusetts Predatory Home Loan Practices Act, G.L.c. 183C (“Act”), and asserts a claim (Count XI) based on the alleged violation. The action is now before the court on Darden’s motion for partial summary judgment as to the liability of defendants Fremont Investment & Loan (“Fremont”) and New England Merchants Corp. (“NE Merchants”) (collectively, “defendants”) on Count XI, and defendant Fremont’s cross motion for partial summary judgment as to its liability on Count XI. For the reasons that follow, Darden’s motion is ALLOWED and Fremont’s cross motion is DENIED.
BACKGROUND
The summary judgment record reveals the following undisputed facts. In late October or early November 2004, Darden, a single mother with two children whose regular income was $800 per month from Social Security Disability payments, applied for a $351,200.00 home mortgage loan with NE Merchants as broker. Darden’s loan application was submitted to Fremont as lender. By letter dated November 5, 2004, Fremont informed Darden that it was evaluating her loan application, and that it would inform NE Merchants when the evaluation was complete.
On November 19, 2004, Fremont’s $351,200.00 loan to Darden (“Loan”) closed. On that date, Darden signed a mortgage and note (“Note”). The Note contains the following language: “IDarden] may make a full or partial prepayment; however, the Note Holder may charge [Darden] for the privilege of prepayment.” It is undisputed that under the Note, the maximum that Fremont could have charged Darden for prepayment is $10,746.00. As part of the loan transaction, Fremont paid NE Merchants a $7,024.00 yield spread premium (“YSP”), which was based on the interest rate that NE Merchants charged Darden on the Loan.[3]
After two years, the rate on the Loan increased, and Darden could no longer keep up with her mortgage payments. Fremont initiated foreclosure proceedings against Darden, and thereafter, she filed this action.
DISCUSSION
I. Summary Judgment Standard
Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. See Mass.R.Civ.P. 56(c); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983). The moving party bears the burden of affirmatively showing that there is no triable issue of fact. See Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). A party moving for summary judgment who does not have the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party’s case or by showing that the non-moving party has no reasonable expectation of proving an essential element of its case at trial. See Kourouvacilis, 410 Mass, at 716. Once the moving party “establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat [the] motion.” See Pederson, 404 Mass, at 17. The court reviews the evidence in the light most favorable to the nonmoving party, but does not weigh evidence, assess credibility, or find facts. See Attorney Gen. v. Bailey, 386 Mass. 367, 370-71 (1982).
II. Analysis
The defendants make several arguments as to why Darden is not entitled to summary judgment on their liability as to Count XI, and the court will address each one separately.
A. Applicability of the Act
The defendants first argue that the Act does not apply to the Loan because it took effect after Darden had already applied for the Loan. The Legislature approved the Act (Chapter 268 of the Acts of 2004) on August 9, 2004. According to “Chapter 268 of the Acts of 2004 An Act Prohibiting Certain Practices in Home Mortgage Lending: Frequently Asked Questions — As of October 2005,” found on the Massachusetts Division of Banks website (“FAQ”), the Act “will apply to all loan applications received on or after November 7, 2004.”[4] Because the summary judgment record shows that Fremont received Darden’s loan application sometime before November 5, 2004, the defendants assert that the Act does not apply to the Loan. The court disagrees.
*450 The defendants’ reliance on the FAQ as the authoritative source regarding the Act’s applicability is misplaced. The FAQ do not have the force of law, as they are not duly-promulgated regulations of the Division of Banks. Cf. Global NAPs, Inc. v. Awiszus, No. SJC-10586, slip op. at 11 (Aug. 9, 2010) (regulations have force of law and are given deference, but agency guidelines do not have force of law); see also G.L.c. 183C, §19 (“The commissioner shall promulgate regulations necessary to carry out the provisions of this chapter”); 209 Code Mass. Regs. §40.00 et seq. (2002). The court is therefore not obligated to defer to the Division of Bank’s FAQ as a “reasonable interpretation of a statute by the administrative agency charged with its administration enforcement.” Water Dep’t of Fairhaven v. Department of Envtl. Protection, 455 Mass. 740, 744, 749 (2010) (where statute “gives substantial authority to the department to carry out the purposes of [G.L.c. 21G], but only through the adoption of regulations," conditions imposed on individual applications rather than in regulations held invalid).
Nor do the FAQ even constitute an official Division of Banks guidance, unlike the document the Supreme Judicial Court cited in Commonwealth v. Fremont Inv. & Loan, 452 Mass. 733 (2008), which the defendants point to as support for their assertion that the FAQ are authoritative regarding the Act’s applicability. In Fremont Inv. & Loan, the court cited to “Consumer Affairs and Business Regulation, Massachusetts Division of Banks, Subprime Lending (Dec. 10, 1997)” (“subprime guidance”).[5] 452 Mass, at 744. Unlike the FAQ, the subprime guidance has a specific date, is addressed to a specific audience (Chief Executive Officer of Each State-Chartered Financial Institution and Each Licensed Mortgage Lender/Broker and Small Loan Agency), and is “signed” by the then-Commissioner of Banks, Thomas J. Curry. Further, the subprime guidance includes explicit citations to Massachusetts statutory and regulatory law and to federal administrative materials. The FAQ, on the other hand, while referencing federal law, do not contain any explicit citations, and they do not cite anything as a basis for the conclusion that the Act applies only to loan applications received after November 7, 2004.[6] If the Division of Banks intended to govern the applicability date of the Act, it should have done so by promulgating regulations pursuant to G.L.c. 183C, §19. See Water Dep’t of Fairhaven, 455 Mass, at 749; cf. Global NAPs, Inc., No. SJC-10586, slip op. at 9, 11 (Massachusetts Commission Against Discrimination guidelines issued pursuant to explicit statutory authority entitled to substantial deference).
Under the Massachusetts Constitution, non-emergency acts take effect ninety days after their approval. See Mass. Const. art. 48, The Referendum, I; Adams v. Board of Assessors of Westport, 76 Mass.App.Ct. 180, 181 n.5 (2010), rev. denied, by 456 Mass. 1106, citing Opinion of the Justices, 368 Mass. 889, 892-93 (1975). There is nothing in Chapter 268 of the Acts of 2004 to indicate that the Act is an emergency measure. It is therefore a non-emergency act, and it took effect ninety days after its August 9, 2004 approval, on November 7, 2004.
The plain language of the Act governs the terms and conditions of high-cost home mortgage loans. See G.L.c. 183, §§5-12 (high-cost home mortgage loans shall not “contain” or “include” certain features). There is no mention anywhere in the Act of home mortgage loan applications. Thus, it is reasonable to interpret the Act as applying to high-cost home mortgage loans closed after its effective date, November 7, 2004, because it is only then that a loan’s terms and conditions, i.e., what the Act governs, are final.[7] See Fremont Inv. & Loan, 452 Mass, at 749 (Act is “established, statutory expression of public policy that it is unfair for a lender to make a home mortgage loan . . . in circumstances where the lender does not reasonably believe that the borrower will be able to make the scheduled payments and avoid foreclosure” (emphasis added). The Loan closed on November 19, 2004. Accordingly, because this was after the Act’s November 7, 2004 effective date, the Act applies to the Loan.[8]
B. High-Cost Home Mortgage Loan
The defendants next argue that even if the Act applies to the Loan, the Loan is not a high-cost home mortgage loan. The Act defines “high[-]cost home mortgage loan” as “a home mortgage loan that meets 1 of the following conditions . . . (ii) Excluding either a conventional prepayment penalty or up to 2 bona fide discount points, the total points and fees exceed the greater of 5 per cent of the total loan amount or $400.” G.L.c., 183C, §2. “Points and fees” include “the maximum prepayment fees and penalties that may be charged or collected under the terms of the loan documents” and “all compensation paid directly or indirectly to a mortgage broker.”[9] Id. Five percent of Darden’s total loan amount ($351,200.00) is $17,560.00. Thus, for the Loan to be a high-cost home mortgage loan, its points and fees must exceed $17,560.00. The parties disagree over how the total points and fees of the Loan should be determined.
It is undisputed that the “maximum prepayment fees and penalties” are $10,746.00. The defendants attempt to dispute Darden’s assertion that this amount should be included in the points and fees by stating that Fremont was not required to, and that there is no evidence that it did, charge a prepayment penalty. However, the Act does not limit the inclusion of prepayment fees and penalties to those that the lender was obligated to charge or did in fact charge. Rather, points and fees include “the maximum prepayment fees and penalties that may be charged or collected under the terms of the loan documents.” G.L.c. 183C, §2 (emphasis added). Under the Note, “the Note Holder may charge [Darden] for the privilege of prepayment.” Thus, $10,746.00, representing the maximum prepayment fees and penalties, must be included in the total points and fees.
*451 The defendants also assert that the YSP Fremont paid to NE Merchants should not be included in the points and fees as “all compensation paid directly or indirectly to a mortgage broker.” The defendants’ assertion is based on distinguishable authority. They first cite several letters from the Division of Banks stating that a yield spread premium is not included in the definition of “points and fees.” According to the first letter, “it has been the Division’s consistent position that ... [a] “yield spread premium’ ... is not included in the definition of ‘points and fees.’ ” The letters, dated July 12, 2001 and August 2, 2001, do not address the Act, nor could they, as the Legislature did not enact the Act until 2004.[10] Rather, the letters address the definition of “all compensation paid to mortgage brokers,” which is found in an older version of 209 Code Mass. Regs. §32.32(2)(a)e, and concludes that a yield spread premium is not included in the definition.[11] The Act, on the other hand, includes in the definition of “points and fees” “all compensation paid directly or indirectly to a mortgage broker” (emphasis added). G.L.c. 183C, §2. Thus, the conclusion of the Division of Banks in the two letters does not apply to the Act.
The defendants next cite several cases from other jurisdictions that hold that a yield spread premium should not be included in the calculation of loan fees. These cases are also distinguishable from this case. In Bank of New York v. Mann, 2004 WL 1878293 at *6 (N.D.Ill. 2004), the U.S. District Court held that a yield spread premium the lender paid to the mortgage broker was not a fee for purposes of the Illinois Interest Act (“IIA”). Unlike the Act, though, the IIA “limits a charge in addition to the stated rate of interest payable directly or indirectly by the borrower and imposed directly or indirectly by the lender. ” Id. (emphasis in original). The Court also made the following observation which supports Darden’s assertion that the YSP should be included in the Loan’s points and fees: “Although a YSP could reasonably be found to be a charge payable indirectly by the borrower by way of a higher interest rate, it is not a charge in addition to the stated rate of interest.” Id.
In Wolski v. Fremont Inv. & Loan, 25 Cal. Rptr. 3d 500, 503-04 (Cal.Ct.App. 2005), the California Court of Appeal held that a yield spread premium could not be considered part of a loan’s points and fees under California’s predatory lending statute. However, that statute limits points and fees to those “payable by the consumer at or before closing.” Id. at 504; see also Maluski v. U.S. Bank, N.A., 2008 WL 5102013 at *5 (S.D.Tex. 2008) (yield spread premium paid by lender to broker not a fee where Texas constitution limits fees to those paid by owner or owner’s spouse), affd, 349 Fed.Appx. 571 (5th Cir. 2009). There is no such limitation in the Act, and Wolskis holding is therefore distinguishable.
The defendants have failed to cite any binding or persuasive authority to support their proposition that the YSP Fremont paid NE Merchants should not be included in the total points and fees under the Act.[12] Thus, the court concludes that the $7,024.00 YSP must be included in the calculation of the Loan’s total points and fees.[13] Adding the $10,746.00 “maximum prepayment fees and penalties” and the $7,024.00 YSP “paid . . . indirectly to a mortgage broker,” the points and fees total at least $17,770.00.[14] Because this exceeds $17,560.00, or 5% of the amount Darden borrowed, the Loan is a high-cost home mortgage loan under the Act. See G.L.c. 183C, §2.
C. Violations of the Act
The court has already determined that the Act applies to the Loan, and that the Loan is a high-cost home mortgage loan. The only remaining question is whether, given the undisputed facts, either of the parties is entitled to judgment as a matter of law. In Count XI of her complaint, Darden alleges that the defendants violated §§5 and 6 of the Act. The court agrees.
Section 5 of the Act provides that “[a] high-cost home mortgage loan shall not contain any provision for prepayment fees or penalties.” G.L.c. 183C, §5. It is undisputed that Fremont could have charged Darden a fee “for the privilege of prepayment.” Section 5 does not limit liability to lenders who actually charge prepayment fees. Rather, it merely prohibits the inclusion in a high-cost home mortgage loan of any prepayment fee. Accordingly, because the Loan indisputably included a prepayment fee, the defendants violated the §5 of the Act.[15]
Section 6 states that “[a] high-cost home mortgage loan shall not include the financing of points and fees greater than 5 per cent of the total loan amount or $800, whichever is greater.” G.L.c. 183C, §6. The court has already determined that the Loan’s total points and fees exceeded 5% of the amount Darden borrowed. The defendants therefore violated §6 of the Act.
ORDER
For the foregoing reasons, it is hereby ORDERED that Darden’s motion for partial summary judgment as to the liability of Fremont and NE Merchants on Count XI of Darden’s complaint be ALLOWED, and that Fremont’s cross motion for partial summary judgment as to its liability on Count XI be DENIED.

 “Yield spread premiums are payments made by lending institutions to mortgage brokers based on the rate of interest charged on a borrower's loan. The higher the interest rate, the larger the yield spread premium payment." Howell E. Jackson & Laurie Burlingame, Kickbacks or Compensation: The Case of Yield Spread Premiums, 12 Stan.J.L.Bus.&Fin. 289, 289 (2007).

 The FAQ are found at: http://www.mass.gov/7page-ID=ocaterminal&L=4SdLO=Home&LI=Business&L2Banldng +Industry+Services&L3=FAQs&sid=Eoca&b=terminalconte nt&f=dob_faq_ch268&csld=Eoca (last visited Aug. 6, 2010).

 This document is found at: http://www.mass.gov/?pageID=ocaterminal&L=4&L0=Ho me&Ll=Business&L2=Banking+Industry+Services&L3=In dustiy+Letters&sid=Eoca&b=terminalcontent&f=dob_subpr ime&csid=Ecoa(last visited Aug. 9, 2010).

 The reference to federal law is not in relation to the Act, but rather to G.L.c. 183, §28C, which Chapter 268 of the Acts of 2004 amended.

 As Darden notes, a loan application does not create a binding contract with certain terms and conditions. Indeed, Fremont’s letter in response to Darden’s loan application contains the following language: “The enclosed documentation does not constitute a commitment. Your loan application is being evaluated and we will notify your broker when the evaluation is complete.” It does not make sense, then, for the key date regarding the Act’s applicability to be the loan application date, when it is the signed loan documents that constitute the binding contract between lender and borrower.

 The court declines to address the defendants’ Contracts Clause and public policy arguments, as they fail to cite any authority to support those arguments.

 “Points and fees” also include “items required to be disclosed pursuant to Sections 226.4(a) and 226.4(b) of Title 12 of the Code of Federal Regulations,” G.L.c. 183C, §2, which Darden asserts equal $1,909.00. This amount is ultimately inconsequential to the calculation of the total points and fees, though, because the other two amounts the court lists above (prepayment fees and penalties and compensation paid directly or indirectly to a mortgage broker) exceed 5% of the total amount Darden borrowed.

 The relevant portion of the second letter, dated August 2, 2001 and appearing in the summary judgment record at exhibit K, is not in the record. Only the first page of the letter is in the record, and it makes no mention of yield spread premiums. According to the defendants, the second letter states the same thing regarding yield spread premiums as does the first letter.

 Nhe statutory authority for 209 Code Mass. Regs. §§32.00 et seq. comes from G.L.c. 140D, §§3 and 29.

 The defendants also cite Escher v. Decision One Mtge. Co., 417 B.R. 245 (E.D.Pa. 2009), to support their assertion. Escher addresses whether a yield spread premium must be disclosed under the Truth in Lending Act, which is a different question than the one before the court.

 At least one journal publication has also concluded that a yield spread premium must be included in the total points and fees under the Act. See Therese G. Franzen & Leslie M. Howell, Predatory Lending Legislation in 2004, 60 Bus. Law 677, 682 (2005).

 The defendants attempt to establish a dispute regarding whether Darden indirectly paid for the YSP by citing the lack of causal relationship between the YSP and the increase in Darden’s initial interest rate. However, Fremont’s Mass.RCiv.P. 30(b)(6) designee testified at her deposition in the following manner:
Q: Does this page indicate how much Ms. Darder’s initial interest rate was increased because of the yield spread premium?
A: Yes.
Q: And can you tell me what it indicates?
A: The YSP was 2 percent, so it was a 1.50 increase [in Darden’s interest rate].
(Emphasis added.)
The defendants have not cited to any evidence in the record to controvert the designee’s characterization of the causal relationship.

 NE Merchants argues that it cannot be liable for any violation of the Act because §18 provides that “]o]riginating or brokering a home loan that violates a provision of this section shall constitute a violation of this chapter.” G.L.c. 183C, §18. Because Darden does not allege a violation of §18, NE Merchants asserts that it is not liable as a broker for any violations. Even were this assertion accurate — which is doubtful given that § 18 is the remedial portion of the Act and therefore provides relief for violations of the other sections— the Act’s definition of Tender” specifically provides that “(for the purposes of this chapter, lender shall also mean a broker.” G.L.c. 183C, §2. NE Merchants, the Loan’s broker, is therefore liable to the same extent as is Fremont, the Loan’s lender.